Filed 10/24/24  P. v. Ocampo CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B330976 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA424985) |
| v. | |
| ANDORENI LAZARO OCAMPO, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, William C. Ryan, Judge.  Affirmed.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Kathy S. Pomerantz, Deputy Attorney General, for Plaintiff and Respondent.

_____

Andoreni Lazaro Ocampo appeals from a postjudgment order denying his petition for resentencing under Penal Code former section 1170.95 (now section 1172.6).[1] In 2015 a jury convicted Ocampo of second degree murder, and the trial court sentenced him to 15 years to life. In 2020 Ocampo petitioned for resentencing, seeking relief from his 2015 conviction. Following briefing and an evidentiary hearing, the superior court denied the petition.

On appeal, Ocampo contends the superior court applied the substantial evidence standard instead of the correct legal standard of proof beyond a reasonable doubt. Ocampo also argues there was not substantial evidence to support the superior court's finding that, under current law, Ocampo is guilty of implied malice murder as an aider and abettor. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Evidence at Trial*

On the evening of April 25, 2014, members of the "H2O" and "BYMS" tagging crews—Ocampo, Saul Ambriz, Joao Bonilla, Giovanni Garcia, Felix Garcia, Jesse Chavez, and other individuals—were at Ocampo's house drinking beers and smoking.[2] Ocampo was a member of H2O, and Ambriz and Bonilla were members of BYMS.[3] Bonilla testified that Ocampo

---

[1] Further statutory references are to the Penal Code.

[2] We refer to Giovanni and Felix Garcia by their first names to avoid confusion.

[3] "BYMS" was identified as "BUMS" by another member, Josue Bernal, who testified at trial. Bonilla and Bernal testified

2

became upset and agitated and wanted to leave and drive around. Bonilla told Ocampo to calm down, and Ocampo turned his anger toward Bonilla. Ocampo lifted his shirt to show Bonilla a scar down the length of his abdomen, which Ocampo said was the result of a stabbing three months earlier by a member of a rival tagging crew. Referring to the scar, Ocampo said, "Look what they did to me." As Ocampo continued to be aggressive toward Bonilla, others at the gathering tried to calm him down, telling him to "relax." One member of the group told Ocampo, "[Bonilla]'s not the enemy, he's a homie." At that point Ocampo ceased being aggressive toward Bonilla, but the group was still "pumped up" and "emotional." Bonilla heard someone say they should go "lurking," which meant hunting for enemies. In

---

generally regarding the tagging crew culture. BYMS and H2O were separate tagging crews, whose members were friendly with each other. Each tagging crew had its own territory and hand signs, and members of the groups often had nicknames or monikers by which they were known. The tagging crews also had rivals who had their own territories. When one crew encountered the graffiti art of a rival crew, its members would cross it out as a sign of disrespect and write the name of their own crew. Rival crews would retaliate in kind. Often when they went out tagging, members of the crews would bring bats or other weapons to protect themselves from rivals. Detective Armando Mendoza, who testified as an expert witness on tagging crew culture, confirmed Bonilla's and Bernal's firsthand descriptions that tagging crews engaged in graffiti art, formed alliances and rivalries, established known territories, retaliated against one another for disrespectful behavior and graffiti, and, on occasion, committed violence against rival crews.

response to the lurking comment, Ocampo said, "Let's go get an enemy."

Before the group left the house, Ambriz and Giovanni told Bonilla they were carrying knives. Ocampo and Giovanni got into a car driven by Felix. A few moments later Bonilla, Ambriz, and a third young man got into a car driven by Chavez. Although Bonilla asked Chavez to take him home, Chavez followed Felix's car.

Around 9:00 p.m. Felix, Giovanni, and Ocampo arrived near the intersection of Vermont Avenue and 40th Place, a location within the territory of "UTF," a tagging crew that was a rival of both BYMS and H2O. Ocampo and Giovanni got out of the car and walked down Vermont Avenue, where they encountered Osmin Cerna leaving a liquor store carrying a backpack and a skateboard. Cerna identified himself as a member of UTF. Ocampo and Giovanni attacked Cerna, causing him to drop his skateboard. Cerna put his hands up and said, "Why are you all attacking me?" The two young men kept striking Cerna, and Cerna tried to retreat. Ocampo and Giovanni pursued Cerna, and Giovanni picked up the skateboard and swung it at Cerna. Cerna tried to defend himself and was able to knock Ocampo down, but Ocampo got up and kept fighting.

A few minutes after the fight started, Chavez arrived at the location with Ambriz and the third man. Ambriz and the other man got out of the car and ran to the fight. Bonilla saw Ocampo, Giovanni, and two or three others fight with Cerna. The attackers surrounded Cerna, who was on the ground. Cerna was unable to get up and was screaming, "Help! Stop!" After another few minutes the attackers returned to their cars and drove away. Bonilla testified he got into Felix's car along with Giovanni and

4

Ocampo. Bonilla heard Ocampo say, "'We got him, we got him good.'"

Paramedics arrived and took Cerna to the hospital, where he died that night. The medical examiner testified Cerna had been stabbed nine times during the fight, twice in the back, once in the buttocks, once in the chest, twice in the abdomen, and twice in the face. The fatal wound was the chest wound, which had pierced the heart. One of the abdominal wounds might also have been fatal if not treated.

Bernal, who had not been present at Ocampo's house or at the scene of the murder, called Ambriz on his cell phone between 9:00 and 10:00 p.m. on the night of the fight. Ambriz answered and said, "We seen some enemies. I'll call you back later." Bernal spoke to Ambriz later that night, and Ambriz said they had "caught some enemies slippin." Bernal understood that to mean they had "caught people walking down the street that we don't get along with." Around 3:00 a.m. the following morning, Bernal and Ambriz went tagging with some other friends. While in the car Bernal heard Ambriz say he had taken out his knife and stabbed Cerna during the fight. Bernal testified he had seen Ambriz carrying different types of knives on previous occasions.

On April 26, 2014, the day after the murder, someone called a BYMS meeting at Bernal's house. Bernal testified that that there were at least seven individuals in attendance, including Bonilla and Ambriz. The discussion turned to the incident the previous night, and Ambriz stated he had stabbed Cerna twice. Bonilla likewise testified that Ambriz said he had stabbed Cerna. Ocampo said he had a knife at the time but dropped it during the fight. The police recovered a folding knife

with its blade locked in an open position at the scene of the fight. There was no blood or DNA found on the knife.

Ocampo did not testify at trial or present any witnesses in his defense.

B.    *The Verdict, Sentencing, and Prior Appeal*

The jury found Ocampo guilty of second degree murder, and the trial court sentenced him to an indeterminate term of 15 years to life.  Ocampo appealed, and we affirmed.  (*People v. Ambriz* (Apr. 20, 2017, B268685) [nonpub. opn.].)

C.    *Petition for Resentencing, Evidentiary Hearing, and Denial of Petition*

On January 3, 2020 Ocampo filed a form petition for resentencing seeking to vacate his murder conviction and be resentenced in accordance with recent statutory changes relating to felony murder and the natural and probable consequences doctrine.  In his petition, Ocampo checked boxes stating he was "convicted of 1st or 2nd degree murder pursuant to the felony murder rule or the natural and probable consequences doctrine" and he "could not now be convicted of 1st or 2nd degree murder because of changes made to Penal Code §§ 188 and 189, effective January 1, 2019."  At Ocampo's request, the superior court appointed him counsel.  The People filed a response to the petition, and on August 31, 2021 the court issued an order to show cause.[4]

---

[4]    Judge Rand S. Rubin presided over the trial but retired in 2015.  Judge William C. Ryan issued the order to show cause and presided over the evidentiary hearing.

After additional briefing from the parties, on January 26, 2023 the superior court held an evidentiary hearing. At the hearing, the prosecutor introduced the transcript from Ocampo's 2015 trial, the exhibits admitted at trial (including surveillance video footage of Ocampo and Giovanni's fight with Cerna, which was played for the court), and our opinion in *Ambriz, supra*, B268685 (for the procedural history of the case). The prosecutor argued that on the night of the incident, Ocampo was upset that he had been stabbed by a rival tagging crew several months earlier; he was armed with a knife; and he "was angry and out hunting for an enemy." Further, Ocampo instigated the fight; he "was a direct perpetrator in the assault"; he knew that "going and intending to stab an enemy is going to result in death"; and he was armed and had the intent to kill.

Ocampo's attorney acknowledged Ocampo was upset on the night of the incident. But he argued Ocampo fought without a weapon, and Ocampo did not plan or coordinate the fight against Cerna. He maintained Ocampo dropped the knife when Cerna knocked him to the ground. He also argued there was no evidence that Ocampo stabbed Cerna, knew that other people had knives, or intended for others to stab Cerna.

At the continued evidentiary hearing on February 2, 2023, following additional argument from counsel, the superior court took the matter under submission. On May 11, 2023 the court issued an 11-page decision denying Ocampo's petition for resentencing under section 1172.6. The court found "overwhelming evidence of Petitioner's implied malice aforethought." The court explained, "Petitioner's malice originated when he rallied the others for a retaliatory attack and armed himself with a knife. Petitioner and the others already

7

had in mind when they arrived at the scene, before they select the victim, that they are going [to] "'hunt.'" Petitioner was the initial and constant aggressor in the fight. He was armed with a knife that was later found with the blade in an open position. The open blade, combined with Petitioner's agitated state and desire to go hunting for an enemy in retaliation for his own prior stabbing evinces an intent to use the blade in a fatal manner. Moreover, Petitioner intentionally attacked Cerna with an open knife; the natural consequence of which is dangerous to human life. Petitioner, having been a stabbing victim himself, is acutely aware that attacking someone with a knife is dangerous to human life, yet he deliberately attacked Cerna and left him bleeding on the sidewalk. Consequently, Petitioner is liable for second degree murder under an implied malice [theory]."

The superior court continued, "[T]he evidence presented here supports a conviction under an aiding and abetting theory of liability." The court reasoned, "Petitioner knew the purpose of the group's outing, including the actual killer's (Ambriz), was to go lurking or hunting for the enemy because Petitioner was the one who rallied . . . the BYMS and H2O crews to go find a rival crew. Petitioner not only encouraged the attack, but facilitated the murder by going to enemy territory, arming himself, selecting the victim, being the initial and continual aggressor throughout the attack, then leaving the victim to die."

The court added, "Petitioner's argument that there is no evidence that he ever shared in the actual killer's intent to stab the victim[] and that he did not have notice that the actual perpetrator had a knife or intended to kill the victim is not supported by the record here. He also alleges that there was no coordination or shared destination between the three cars to go

8

lurking, but offers no other explanation for how the cars ended up at the same location within minutes of each other after all having discussed going lurking.  Petitioner himself rallied the others at his house, including Ambriz, to go hunting or lurking for enemies, and violence between rival tagging crews was common, and even occasionally resulting in death.  Members of tagging crews frequently carried weapons, Ambriz was known by members of the crews to carry a knife on occasion, and indeed announced he was carrying a knife that night.  Even more, after leaving to go 'get an enemy,' Petitioner announced in the car leaving the scene of the murder that 'We got him, we got him good.'"

Ocampo timely appealed.

## DISCUSSION

A.    *Senate Bill No. 1437 and Section 1172.6*

Senate Bill No. 1437 (Senate Bill 1437) eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder and significantly limited the scope of the felony-murder rule. (*People v. Strong* (2022) 13 Cal.5th 698, 707-708; *People v. Lewis* (2021) 11 Cal.5th 952, 957; *People v. Gentile* (2020) 10 Cal.5th 830, 842-843, 847-848 (*Gentile*); see *People v. Reyes* (2023) 14 Cal.5th 981, 984 (*Reyes*).)  Section 188, subdivision (a)(3), now prohibits imputing malice based solely on an individual's participation in a crime and requires proof of malice to convict a principal of murder, except under the revised felony-murder rule as set forth in section 189, subdivision (e). (*Reyes*, at p. 986; *Gentile*, at pp. 842-843.)  Section 189, subdivision (e), now requires the People to prove specific facts relating to the defendant's individual culpability:  The defendant was the actual killer (§ 189, subd. (e)(1)); although not the actual

killer, the defendant, with the intent to kill, assisted in the commission of murder in the first degree (§ 189, subd. (e)(2)); or the defendant was a major participant in an underlying felony listed in section 189, subdivision (a), and acted with reckless indifference to human life as described in section 190.2, subdivision (d) (the felony-murder special-circumstance provision) (§ 189, subd. (e)(3)).  (See *Strong*, at p. 708.)  Senate Bill No. 775 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 551, § 2), effective January 1, 2022, expanded the scope of potential relief to apply Senate Bill 1437's ameliorative changes to individuals convicted of attempted murder and voluntary manslaughter. (See § 1172.6, subd. (a).)

Senate Bill 1437 also provided a procedure (now codified in section 1172.6) for an individual convicted of felony murder or murder under the natural and probable consequences theory or other theory under which malice is imputed to a person based solely on that person's participation in a crime to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if the individual could not have been convicted of murder under Senate Bill 1437's changes to sections 188 and 189.  (*People v. Lewis, supra*, 11 Cal.5th at p. 959; *Gentile, supra*, 10 Cal.5th at p. 847.)

If the section 1172.6 petition contains all the required information, including a declaration by the petitioner that he or she is eligible for relief based on the requirements of subdivision (a), the sentencing court must appoint counsel to represent the petitioner upon his or her request pursuant to section 1172.6, subdivision (b)(3).  Where a petitioner makes the requisite prima facie showing the petitioner falls within the provisions of section 1172.6 and is entitled to relief, the court

10

must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and resentence the petitioner on any remaining counts.  (§ 1172.6, subds. (c) & (d)(1).)

Section 1172.6, subdivision (d)(3), provides that at the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. . . .  A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.  If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges."

We review the superior court's decision to deny the petition after an evidentiary hearing for substantial evidence, provided the court understood the elements of the offense and applied the proper standard and burden of proof.  (*Reyes, supra*, 14 Cal.5th at p. 988; *People v. Vargas* (2022) 84 Cal.App.5th 943, 951.) "[W]here there is an issue as to whether the trial court misunderstood the elements of the applicable offense, the case presents a question of law which we review independently." (*Reyes*, at p. 988.)

11

B.     *The Superior Court Applied the Correct Legal Standard*

Ocampo contends the superior court erred in reviewing the evidence for substantial evidence instead of applying the correct standard of proof to require the prosecution to prove beyond a reasonable doubt that Ocampo was guilty of murder.  The court stated in its written decision, "[T]he court finds that Petitioner could today be found guilty beyond a reasonable doubt of second degree murder under implied malice, and aiding and abetting theories of liability."[5]  Although the superior court was imprecise when it stated that Ocampo "could today be found guilty beyond a reasonable doubt" instead of saying Ocampo "is guilty beyond a reasonable doubt," the record shows the court and the parties were aware of the correct legal standard.  In response to Ocampo's petition, the prosecutor acknowledged, "The prosecution has the burden at the hearing to prove beyond a reasonable doubt that the petitioner is *ineligible* for resentencing."  In its order to show cause, the court stated "the People bear the burden of proving Petitioner's ineligibility for relief beyond a reasonable doubt."  And in Ocampo's *ex parte* application for appointment of a defense investigator, Ocampo stated, "At the hearing to determine whether petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing."

At the outset of the January 26, 2023 evidentiary hearing, the court asked, "Who wants to go first?"  Ocampo's attorney

---

[5]     Ocampo asserts the superior court stated "'the prosecution *could* prove that petitioner was guilty beyond a reasonable doubt,'" citing to the court's memorandum of decision.  The court's decision does not contain that statement.

12

responded, "I think it's the People's burden," and the court replied, "Yeah." The prosecutor then proceeded to discuss the evidence at trial and presented her argument. In response, Ocampo's attorney argued with respect to the aiding and abetting theory of liability that the "People have to prove that Mr. Ocampo knew that the perpetrator intended to commit the crime of murder. They have to establish, prove beyond a reasonable doubt, that Mr. Ocampo knew that. They can't." Ocampo's attorney reiterated, "[T]he court knows you have to prove the case beyond a reasonable doubt. That's the burden on the People. I don't believe that they can prove it now that the law's changed." He concluded his argument by stating, "[I]n light of the change in the law, in light of the People's theory in what is still a natural and probable consequence theory, they cannot prove their case beyond a reasonable doubt." The superior court did not at any time state that Ocampo's attorney's description of the prosecution's burden was incorrect or that the People did not have the burden of proving their case beyond a reasonable doubt. In light of this record, it is clear that the court in its findings was aware of the correct legal standard and found the People had proven beyond a reasonable doubt that Ocampo was guilty of second degree murder under current law.

C.    *Substantial Evidence Supports the Superior Court's Finding of Aider and Abettor Liability*

"'[N]otwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of

13

another and acts with conscious disregard for life.'" (*Reyes, supra*, 14 Cal.5th at p. 990; accord, *Gentile, supra*, 10 Cal.5th at p. 850.) "'[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. [Citation.] In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.'" (*Reyes,* at pp. 990-991; accord, *People v. Curiel* (2023) 15 Cal.5th 433, 463; *People v. Powell* (2021) 63 Cal.App.5th 689, 712-713.)

Ocampo contends there is insufficient evidence to support the trial court's findings beyond a reasonable doubt that Ocampo aided and abetted the second degree murder. He asserts the evidence, at most, shows he was merely part of the group that committed the assault, he had no knowledge of Ambriz's intent to commit the stabbing, and he did not assist in the stabbing. Ocampo's contentions lack merit.

Substantial evidence supports the superior court's finding that Ocampo possessed the requisite actus reus in aiding and abetting the murder. As the superior court found, Ocampo by his words and conduct aided the commission of the stabbing by encouraging his fellow tagging crews (BYMS and H2O) to "hunt"

14

for a rival tagging crew member. On the night of the incident, Ocampo was agitated and upset, and he got angry with Bonilla after Bonilla told him to calm down. Ocampo showed Bonilla an abdominal scar, which resulted from a stabbing three months earlier by a rival tagging crew member, and said, "Look what they did to me." When someone suggested the group go "lurking," Ocampo responded, "Let's go get an enemy." Ocampo armed himself with a knife, went to the territory of UTF (a rival tagging crew), and initiated the attack on Cerna after Cerna identified himself as a UTF member. During the fight, Ocampo took out his folding knife with the blade locked in an open position, which showed his intent to use the knife on Cerna.

Substantial evidence also supports the superior court's finding that Ocampo harbored the requisite mens rea as an aider and abettor. Ocampo denies that he knew that Ambriz was carrying a knife. But it is a reasonable inference that Ocampo was present when Giovanni and Ambriz told Bonilla before the group left Ocampo's house that they were carrying knives to "hunt" for a rival tagging crew member. And Ocampo was physically fighting with Cerna when Ambriz joined the fight armed with a knife, which further supports the court's finding that Ocampo had knowledge of Ambriz's intent to stab Cerna. Further, Ocampo would have seen Ambriz and possibly others stab Cerna as the group was attacking Cerna.[6] Ocampo intended to assist Ambriz in the stabbing by continuing to attack Cerna as the fight continued. And after Ocampo got into the car to flee, he stated, "We got him, we got him good." Ocampo knew the

---

[6] Cerna was stabbed nine times, but Ambriz admitted to stabbing Cerna twice.

15

stabbing was dangerous to life because he was a victim of a prior stabbing.  He acted in conscious disregard for life by continuing to participate in the attack as Cerna was stabbed, and he left Cerna bleeding on the street.  Ample evidence therefore supports the superior court's finding beyond a reasonable doubt that Ocampo was guilty of second degree murder as an aider and abettor of implied malice murder under current law.[7]

## DISPOSITION

The order denying the petition for resentencing under section 1172.6 is affirmed.

FEUER, J.

We concur:

MARTINEZ, P. J.                STONE, J.

---

[7] Ocampo also contends the denial of his section 1172.6 petition violated his due process rights and the proscription against cruel and unusual punishment under the state and federal Constitutions (U.S. Const., 8th and 14th Amends.; Cal. Const., art. I, §§ 15, 17).  Specifically, Ocampo argues the superior court violated his constitutional rights because the court denied his petition notwithstanding the prosecutor's failure to prove him guilty of second degree murder beyond a reasonable doubt.  Because substantial evidence supports the court's findings beyond a reasonable doubt that Ocampo was guilty of implied malice murder, Ocampo's contentions fail.

16